Exhibit 3
EFiled: Feb 18 2026 04:06PM EST
Transaction ID 78499405
Case No. 2026-0005-NAC

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| MAINSTREAM ENERGY INVESTMENTS LLC, THE ROBERT J. BERMAN TRUST, ROBERT J. BERMAN, and NIKOLA KRNETA, | ) | C.A. No. 2026-0005-NAC |
| Plaintiffs, | ) | **REDACTED PUBLIC VERSION FILED: February 18, 2026** |
| v. | ) | |
| GORAN RAJSIC, ADAM CORTESE, ROBERT DOYLE, ABACUS ENERGY INVESTMENTS LLC, DENOU DWC-LLC, SUN AFRICA LLC, and UGT RENEWABLES LLC, | ) | |
| Defendants. | ) | |

# VERIFIED AMENDED AND SUPPLEMENTAL COMPLAINT

Plaintiffs Mainstream Energy Investments LLC ("Mainstream"), The Robert J. Berman Trust ("RJB Trust"), Robert J. Berman, and Nikola Krneta (collectively, "Plaintiffs") hereby bring this action against Defendants Goran Rajsic, Adam Cortese, Robert Doyle, Abacus Energy Investments LLC ("Abacus"), Denou DWC-LLC ("Denou"), Sun Africa LLC ("Sun Africa"), and UGT Renewables LLC ("UGTR," and collectively, "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1. Plaintiffs are members and managers of Sun Africa and UGTR (the "Companies"), companies that have been hijacked by Goran Rajsic. As two of the four managers on the Companies' Board of Managers, Plaintiffs Berman and Krneta are supposed to have a say in the management of the Companies. Instead, Rajsic has taken the position that he can bypass the deadlocked Board and unilaterally run the Company through his control over the 51% member. Rajsic's flippant attitude to basic corporate governance is best summed up by his two-word response to Plaintiffs' attempts to exercise management rights: "FUCK OFF." (Ex. A).

2. Recognizing the indefensibility of Rajsic's position, Defendants have substituted CEO Adam Cortese for Rajsic and now contend that Cortese's status as CEO gives him the authority to bypass the Board and run the Companies on his own. According to Cortese, as long as the Board remains deadlocked and lacks the power to overrule him, he can simply do what he pleases in perpetuity. Cortese is wrong, and he continues to take unilateral direction from Rajsic and/or to take actions that benefit Rajsic at the expense of Plaintiffs and the Companies.

3. Rajsic's and Cortese's power grab is prohibited by the Operating Agreements, which vest plenary authority over company business in the Board. Nothing in the Operating Agreements gives Rajsic the right, as the majority member, to unilaterally run the Companies. Further, though the Operating Agreements

delegate day-to-day supervisory authority to the CEO, such authority remains subject to the control and direction of the Board. Nothing in the Operating Agreements permits Cortese to make non-day-to-day decisions without Board approval, or to make *any* decisions without proper Board oversight and direction.

4. Based on his flawed view of his own power, Rajsic has sidelined Berman and Krneta and purported to take a series of unilateral acts in violation of their rights as members and managers. Among other things, Rajsic has purported to unilaterally amend the Operating Agreements to appoint himself Chairman of the Board. He has also systematically excluded Berman and Krneta from accessing the Company's books and records or speaking with Company employees. With the assistance of CFO Robert Doyle, Rajsic has also wielded his improper control to enrich himself and his family and friends, including by causing the Companies to make millions of dollars of improper payments to himself, his wife, his daughter, and women with whom he is in romantic relationships. Rajsic has bullied and bribed the Companies' officers—including CEO Cortese and CFO Doyle—into going along with his coup, dangling lucrative bonuses and favors as rewards for their loyalty, and berating and threatening them into submission.

5. Recently, Rajsic and Cortese have escalated their misconduct by holding hostage millions of dollars of mandatory distributions unless Plaintiffs meet Rajsic's demand to surrender a supermajority of membership interests and submit to

his total control. Rajsic routinely compares himself to Elon Musk, claiming that he "cares and leads not in words only but his brain, heart, body power, diminished health and sleep but also with ever increasing stubbornness" and that as "[t]he Majority Shareholder" he is "the one that cannot and will not be replaced." Rajsic has insisted that Berman and Krneta "won't see a cent" until he receives the equity he believes he deserves for his purported Musk-like efforts. CEO Cortese has once again fallen in line, adopting untenable interpretations of the Operating Agreements and inventing pretextual reasons to withhold or diminish the mandatory distributions until Rajsic directs otherwise.

6. If left unchecked, Rajsic and Cortese will continue their power grab and continue to erode and disregard Berman's and Krneta's rights as managers. Despite their status as managers, Berman and Krneta have been denied basic books and records and they have limited insight into the decisions being made by or at the direction of Rajsic and Cortese, preventing them from fulfilling their fiduciary duties as managers.

7. Plaintiffs seek relief to restore proper governance to the Companies and to hold Defendants accountable for their misconduct, which has harmed Plaintiffs and the Companies.

## PARTIES

8. Sun Africa and UGT Renewables are both Delaware limited liability companies that are engaged in the solar energy development business. At all relevant times, the Companies have been operated, controlled, and treated as a single enterprise.

9. Plaintiffs Mainstream Energy Investments LLC and The Robert J. Berman Trust are two of the three members of the Companies. Mainstream is a Delaware limited liability company that holds a 21.25% membership interest in the Companies. The RJB Trust is a revocable Florida trust that holds a 27.5% membership interest in both Sun Africa and UGTR. Mainstream and The RJB Trust have been members of Sun Africa and UGTR since the Companies' respective formations in 2014 and 2020 and together hold 48.75% of the membership interests in the Companies.

10. Plaintiff Robert J. Berman is the trustee of The RJB Trust and a manager of the Companies. Berman is also the rightful Chairman of the Companies' Board of Managers, despite Rajsic's unauthorized attempt to unilaterally remove him from that position.

11. Plaintiff Nikola Krneta is the beneficial owner of Mainstream and a manager of the Companies. From approximately 2014 to 2022, Krneta served as the CEO of the Companies.

12. Defendant Abacus Energy Investments LLC is a Wyoming limited liability company that holds the remaining 51.25% membership interest in the Companies. Until November 11, 2024, Abacus was wholly owned by Mainstream. On November 11, 2024, Mainstream transferred all its interest in Abacus pursuant to a Class A Voting Capital Transfer Agreement (the “Transfer Agreement”) to Denou DWC-LLC (“Denou”). (Ex. B).

13. Defendant Goran Rajsic is a manager of the Companies, having been appointed by Abacus, which Rajsic controls.

14. Defendant Denou DWC-LLC is a United Arab Emirates entity controlled by Rajsic.

15. Defendant Adam Cortese is a manager and the Chief Executive Officer (“CEO”) of the Companies.

16. Defendant Robert Doyle is the Chief Financial Officer (“CFO”) of the Companies.

17. Non-party Holly Christie is the Companies’ General Counsel (“GC”).

18. Upon information and belief, Rajsic has unilaterally directed CEO Cortese, CFO Doyle, and GC Christie to take all acts and decisions described in this Complaint.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action under 6 *Del. C.* §§ 18-110 and 18-111. This Court also has subject matter jurisdiction over this cause in equity under 10 *Del. C.* § 341.

20. This Court has personal jurisdiction over the Companies because they are limited liability companies organized under the laws of the State of Delaware.

21. This Court has personal jurisdiction over Rajsic, Cortese, and Doyle pursuant to 6 *Del. C.* § 18-109 because Rajsic and Cortese are managers of the Companies, and because, as CFO, Doyle participates materially in the management of the Companies by, among other things, overseeing all aspects of the Companies' finances; directing the Companies' accounting and internal controls; reviewing, approving, and executing disbursements; maintaining and controlling access to the Companies' accounts; and exercising approval authority over expense reimbursements and other payments by the Companies.

22. Abacus is a necessary party under Court of Chancery Rule 19(a). This action seeks to interpret and enforce Operating Agreements to which Abacus is a party. This action seeks to compel the Companies to make full quarterly tax distributions for 2024 and 2025 under Section 4.1(a) of the Operating Agreements. A substantial portion of the 2024 tax distributions payable to Abacus relate to the

period when Mainstream owned Abacus (January 1, 2024 through November 11, 2024).

23. Ordering the Companies to make tax distributions to Abacus without addressing Mainstream's claim would prevent Mainstream from obtaining complete relief. Joinder is also proper under the Court's clean-up doctrine because Mainstream's right to receive tax distributions under the Transfer Agreement arises from the same operative facts as the Companies' obligation to make tax distributions.

24. This Court has personal jurisdiction over Denou pursuant to 10 *Del. C.* § 3104(c) and due to its participation in the conspiracy described herein. Denou's conduct has also caused harm to the Companies, which are Delaware companies.

## FACTUAL BACKGROUND

### A. The Companies and Their Governance.

25. Sun Africa and UGTR provide developing countries with life-changing renewable energy solutions and infrastructure development projects and are leaders in the clean energy market. Sun Africa conducts its solar energy development business operations primarily in Africa, while UGTR engages in the same line of business in other regions.

26. The Companies each have three members: (i) Mainstream, which holds a 21.25% membership interest; (ii) The RJB Trust, which holds a 27.5% membership interest; and (iii) Abacus, which holds a 51.25% membership interest.

27. The Companies are governed by substantially identical Operating Agreements dated July 23, 2023 for Sun Africa and July 14, 2021 for UGTR. (Exs. C & D).[1]

28. Section 5.1 of the Operating Agreements vests "the authority to manage the business and affairs of the Compan[ies]" in a Board of Managers (the "Board"), which "shall consist of four (4) managers." (*Id*. § 5.1).

29. The Operating Agreements give each of Mainstream, The RJB Trust, and Abacus the right to designate one manager to the Board, with the CEO of the Companies serving as the fourth manager. (*Id*. § 5.2).

30. Mainstream has designated Krneta to serve as manager, The RJB Trust has designated Berman to serve as manager, and Abacus has designated Rajsic to serve as manager. Cortese, as the Companies' current CEO, is the fourth manager. Rajsic joined the Board in or around November 2024, when he obtained control of Abacus.

---

[1] All citations herein are to the section numbers in the Sun Africa Operating Agreement. In some cases, the numbering in the UGTR Operating Agreement is off by one.

31. The Operating Agreements designate Berman as Chairman of the Board. (*Id.* at Sched. C).

32. The Board may act at a meeting or by written consent. To act at a meeting, "the presence of a majority of the Managers of the Board … shall constitute a quorum, and, except as provided in Section 5.4 hereof, the affirmative vote of a majority of the Managers present shall be necessary for the adoption of any resolution." (*Id.* § 5.8). If the Board acts via written consent, it must be "signed by the number of the Managers that would be necessary to authorize or take such action at a meeting at which all Managers were present and voting." (*Id.* § 5.9).

33. Certain enumerated actions require heightened approval by both a majority of the managers and a supermajority (>75%) of the membership interests (the "Heightened Approval Requirements"). Section 5.4(a) states:

> Notwithstanding anything to the contrary in this Agreement, no action by the Company or its Subsidiaries (including, but not limited to, any action by the Board or any committee thereof) shall be taken with respect to any of the following matters without the approval of a majority of the managers and in excess of 75% in interests of the Unit Holders then outstanding.

(*Id*. § 5.4(a)). The enumerated "following matters" include, among other things, amending the Operating Agreements.

34. Section 5.4(a) identifies a subset of decisions that are subject to the Heightened Approval Requirements; it does not narrow the Board's general authority granted in Section 5.1.

35. The voting provisions underscore this point. Section 5.4(a) requires "the approval of a majority of the Managers"—i.e., three out of four—for the enumerated actions. (*Id.*). But a separate provision provides that, "except as provided in Section 5.4," the Board may act by a majority of the managers *present at a properly quorumed meeting*:

> *Quorum; Voting.* At every meeting of the Board or of any committee thereof, the presence of a majority of the Managers of the Board or committee, as applicable, shall constitute a quorum, and, except as provided in Section 5.4 hereof, the affirmative vote of a majority of the Managers present shall be necessary for the adoption of any resolution.

(*Id.* § 5.8).

36. Thus, if three managers attend a meeting, two votes suffice to approve Board action—except for Section 5.4(a) actions, which always require at least three of the four managers. The explicit carve-out in this section confirms that Section 5.4(a) imposes Heightened Approval Requirements for specific actions, not that Board authority is limited to those items.

37. The parties deliberately structured the Companies to resemble a corporation, with plenary authority vested in the manager-managed Board and day-

to-day supervisory authority delegated to officers under the control and direction of the Board. Officers, including the CEO, have subordinate authority and cannot override or replace the Board's decision-making.

38. Section 5.3 establishes the officer-level positions. Section 5.3(a) provides that the CEO, "subject to the control of the Board," shall "generally supervise the day-to-day management and operations of the Compan[ies]." (*Id.* § 5.3(a)). It further provides: "Except as otherwise provided in this Agreement, the CEO shall perform all duties incident to the office of chief executive officer and such other duties as may be prescribed by the Board from time to time; *provided*, that the CEO shall not, in his capacity as the CEO, have any authority to make any decisions vested solely in the Board, including those decisions set forth in Section 5.4."

39. Section 5.3's use of the word "including" further underscores that Section 5.4(a) imposes Heightened Approval Requirements for specific actions, not that Board authority is limited to those items. The word "including" makes clear that Section 5.4(a)'s list is exemplary only, not exhaustive.

40. Multiple other provisions in the Operating Agreements expressly contemplate Board approval for actions not enumerated in Section 5.4(a). (*See, e.g.*, *id.* §§ 1.6(iv), 5.12, 5.13(a), 6.3(c), 6.7(d)).

41. The Board is currently deadlocked, with Berman and Krneta on one side, and Rajsic and Cortese on the other.

42. The Companies' officers remain subject to the control and direction of the Board, even with a deadlock.

43. The Board deadlock does not give any officer, member, or manager authority to govern the Companies without proper Board oversight and approval.

**B. With the Board Deadlocked, Rajsic and Cortese Bypass the Board and Seize Unauthorized Control of the Companies.**

44. From the Companies' inception to 2022, Krneta served as CEO of the Companies. In 2022, Krneta no longer wanted to serve as CEO and Rajsic suggested Cortese as a replacement. The Board agreed and appointed Cortese as CEO. Krneta continued to serve as a manager of the Companies.

45. Prior to November 2024, Berman and Krneta, as managers, participated in the Companies' business operations in the ordinary course. Rajsic was not a manager during this period but was involved with the Companies on a consulting basis. During this period, there was no need to hold formal Board meetings as the managers were in frequent contact and were generally aligned with respect to the business and affairs of the Companies.

46. In November 2024, Mainstream transferred control of Abacus, which owned 51.25% of the Companies' membership interests, to Denou, which is controlled by Rajsic. At that time, Rajsic also became a member of the Board as Abacus's designee.

47. Disputes among the managers began around the time Rajsic obtained control of Abacus and joined the Board. In late October, in anticipation of the transfer of Abacus to Rajsic's control, Rajsic sent Plaintiffs paperwork to restructure the Companies into a new entity, Sun Energy Group, LLC, in which Abacus (to be controlled by Rajsic) would have 75% of the outstanding membership interests and Rajsic would have three of the five votes on the Board. Berman and Krneta would collectively hold the remaining 25% and two Board votes.

48. Plaintiffs refused to sign the documentation provided by Rajsic, causing him to grow increasingly irate and vindictive.

49. Since obtaining control of Abacus (through Denou), Rajsic has taken the position that his control over the majority member allows him to make unilateral decisions for the Companies and gives him the right to unilaterally direct the Companies' officers. Rather than act with Board approval—as required by the Operating Agreements—Rajsic has claimed that he can bypass the Board entirely and control the Companies as the majority member. As a result, Berman and Krneta have been excluded from oversight and decision-making, in violation of their rights under the Operating Agreements.

50. The Companies' officers and senior employees, including CEO Cortese, CFO Doyle, and GC Christie, are beholden to Rajsic and follow his orders without question. Through their work for the Companies, Cortese, Doyle, and

Christie have earned millions of dollars in annual bonuses and other compensation. The payment of these bonuses is personally approved by Rajsic, who purports to control the Companies' purse strings. As Cortese, Doyle, and Christie have seen, Rajsic rules without regard to contractual or fiduciary restrictions, and his behavior is erratic and vengeful. They know that, if they defy him, they face retribution, including the loss of their lucrative bonuses.

51. Rajsic has also solidified his control over Cortese, Doyle, and Christie by providing them with other material, personal benefits. For example, Rajsic provided CFO Doyle with a substantial loan when Doyle was in a dire financial distress and needed money to pay his mortgage on his residence, as well as a separate emergency personal loan just in December 2025. Rajsic has bragged that, as a result of these favors, he now "owns" Doyle.

52. Because they are beholden to Rajsic, and in breach of their fiduciary duties, CEO Cortese, CFO Doyle, and GC Christie have fallen in line with Rajsic's power grab and have executed his orders without question. GC Christie even went so far as to issue a patently erroneous legal opinion in which she opined that Abacus's 51.25% membership interest gives Rajsic the right to unilaterally take any action not enumerated in Section 5.4(a).

53. Recognizing the indefensibility of their position, after this action was filed, Rajsic and Cortese shifted to a new and equally baseless theory: they now

claim that Cortese, as CEO, can unilaterally run the Companies and that, as long as the Board remains deadlocked, he can do so without Board oversight.

54. This new theory contradicts the text and structure of the Operating Agreements. Although the Operating Agreements delegate day-to-day management of the Companies to the CEO, Cortese remains "subject to the control of the Board" and lacks "authority to make any decisions vested solely in the Board." (*Id.* § 5.3(a)). Defendants' interpretation would nullify these limitations and erase the Board's supervisory role and plenary authority.

55. The new theory is also contrary to the corporate-style structure the parties chose: the Board retains plenary authority, and officers, including the CEO, possess narrower, subordinate authority. A deadlock does not authorize the CEO to supplant the Board or to act unilaterally without oversight.

56. Based on their newly contrived theory, Defendants have caused Cortese to purport to take extraordinary actions beyond his limited authority to manage the Companies' day-to-day operations. These actions are unauthorized and invalid.

### C. Rajsic Dismisses the Other Managers' Efforts to Exercise Management Rights.

57. In December 2024, the Board held its first formal Board meeting since CEO Cortese's arrival and agreed to hold quarterly Board meetings moving forward.

58. Thereafter, an issue arose with respect to the transfer of administrative control over the Companies' bank accounts to CFO Doyle. On February 24, 2025, Cortese wrote to Berman to follow up on the matter, and Berman responded the next day that he had "been in direct contact with" both Doyle and Chase Bank to ensure Doyle receives "the appropriate administrative access." (*Id.* Ex. A). Berman also wrote that he had "facilitated a $900,000 transfer to address the company's immediate liquidity requirements." (*Id*.).

59. Rajsic responded with a rant. Ignoring Berman's response altogether, Rajsic accused Berman of unspecified "scheming" and belittled Berman for being just "a minority shareholder," declaring: "I am the majority shareholder and if anyone is interested in the company's wellbeing it is me." (*Id*.).

60. Rajsic then—bizarrely—berated Berman for making a $900,000 transfer, writing: "What in the world gives you as a minority shareholder any right to decide how much you will open the spigot and mercifully transfer the money? … Simple answer is NADA." (*Id*.).

61. At the conclusion of this rant, Rajsic signed off as follows:

> Goran
> The Majority Shareholder (one who cares and leads not in words only but with his brain, heart, body power, diminished health and sleep but also with ever increasing stubbornness) and the one that cannot and will not be replaced

(*Id*.).

62. Berman responded point-by-point to Rajsic's unfounded accusations and clarified that "[t]he Board of Managers, not individual shareholders, is responsible for governing Sun Africa's operations and financial management." (*Id.*).

63. Rajsic's two-word response summarized his view of the Companies' governance: "FUCK OFF." (*Id.*). Rajsic copied this email to the Companies' management team, ensuring that everyone understood that challenges to Rajsic's authority would be met with crude dismissal rather than reasoned discussion.

64. As discussed below, since then, Rajsic's improper actions and retaliation against Plaintiffs only escalated.

**D. Rajsic Purports to Unilaterally Remove and Replace Berman as Chairman of the Board and Claims to Have Unilateral Power as the Majority Member to Amend the Operating Agreements.**

65. On March 31, 2025, the managers participated in another Board meeting.

66. At this meeting, Rajsic unilaterally declared that, although the Operating Agreements expressly designate Berman as Chairman, Rajsic was removing Berman as Chairman and installing himself in that position instead.

67. As Rajsic recognized, because the Operating Agreements specifically designate Berman as Chairman of the Board, replacing Berman as Chairman requires an amendment. Thus, on April 2, 2025, Rajsic sent a letter to the Companies' counsel

directing them to amend the Operating Agreements to implement his unilateral decree. (Ex. E). The letter states:

> I represent Abacus Energy Investments LLC ("Abacus") as a director of both [Sun Africa] and UGTR. This membership interest affords Abacus to conduct solely the "Majority Vote" or "Majority Vote of the members" as defined in the operating agreements of [Sun Africa] and UGTR ("OA").
>
> Articles 12.1 and 12.2 regulate the amendments of the OA. With rights afforded by the Majority Vote, I, as the director representing Abacus holding the Majority Vote rights, direct the amendment to be made to Schedule C of both OA:
>
> > Removal of Robert Berman as the Chairman of the Board of SA and UGTR.
> >
> > Appointment of Goran Rajsic as the Chairman of the Board of SA and UGTR.
>
> The effects of this decision are immediate. Please prepare the amended Schedule C to reflect this authorized change.

(*Id.*).

68. Contrary to Rajsic's contention, the Operating Agreements do not give him unilateral power to amend the Operating Agreements or replace Berman as Chairman.

69. Section 5.4(a) of the Operating Agreements expressly provides that "[t]he amendment of this Agreement" requires "the approval of" both (i) "a majority of the Managers" and (ii) "in excess of 75% in interests of the Unit Holders then

outstanding." This provision applies in all cases, "[n]otwithstanding anything to the contrary in this Agreement." Specifically, Section 5.4(a) states, in relevant part:

> Notwithstanding anything to the contrary in this Agreement, no action by the Company or its Subsidiaries (including, but not limited to, any action by the Board or any committee thereof) shall be taken with respect to any of the following matters without the approval of a majority of the managers and in excess of 75% in interests of the Unit Holders then outstanding.
>
> …
>
> (xiii) The amendment of this Agreement….

(Ex. C § 5.4(a)).

70. In contrast to the express language in Section 5.4(a), Sections 12.1 and 12.2—the provisions on which Rajsic relied on in his April 2, 2025 letter—are general amendment provisions that cannot override Section 5.4(a)'s specific, mandatory requirements, which apply "[n]otwithstanding anything to the contrary in this Agreement." (*Id.*).

71. Section 12.1 states that amendments require "a Majority Vote of the members" plus "the approval requirements of 5.4(b)." But Section 5.4(b) contains no approval requirements—it states only: "The enumeration of the foregoing rights set forth in subsection (a) hereof shall not diminish or affect the existence or exercise of other rights expressly granted to the Board elsewhere in this Agreement." (*Id*. § 5.4(b)). The reference to Section 5.4(b) is thus a drafting error.

72. Section 12.1 almost certainly intended to reference Section 5.4(a), which does contain "approval requirements"—specifically, that certain actions require the approval of both a majority of the managers and at least 75% of the membership interests. (*Id.* § 5.4(a)).

73. Section 5.4(a) specifically enumerates "the amendment of this Agreement" as an action subject to the Heightened Approval Requirements. (*Id.* § 5.4(a)(xiii)). This specific requirement applies "[n]otwithstanding anything to the contrary in this Agreement" and controls over any general amendment provision in Section 12.1. (*Id.* § 5.4(a)).

74. Rajsic's declaration that he can unilaterally amend the Operating Agreements as the holder of a simple majority of membership interests—without meeting the Heightened Approval Requirements of Section 5.4(a)(xiii)—would also undermine the basic corporate governance structure of the Companies. The Operating Agreements vest "the authority to manage the business and affairs of the Company" in the Board. (*Id.* § 5.1). This plenary authority would be rendered illusory if the majority member could unilaterally amend the Operating Agreements at will, stripping the Board of its function and power. Delaware law does not permit such absurd results that eviscerate the bargained-for governance protections in an operating agreement.

### E. The Companies' General Counsel Backs Rajsic's Improper Takeover Through a Flawed Legal Opinion that Endorses Bypassing the Board's Authority.

75. On April 4, 2025, GC Christie issued a "legal interpretation" designed to provide cover for Rajsic's brazen power grab. (Ex. F).

76. Recognizing that Section 12.1 cannot override the specific amendment provisions of Section 5.4(a)(xiii), Christie did not endorse Rajsic's claim that he can unilaterally amend the Operating Agreements. Nevertheless, she declared Rajsic's unilateral action to be "legally valid as under the Operating Agreement" under an alternative and equally flawed analysis, concluding that, unless an action is specifically enumerated in Section 5.4(a), it can be approved by a "Majority Vote," *i.e.*, with a simple majority of the membership interests, with no Board involvement at all. (*Id.*).

77. Based on her flawed and self-interested analysis, Christie concluded that, because the Operating Agreements do not specifically state Board approval is required to replace the Chairman, that decision "would be properly taken by Majority Vote," *i.e.*, by a simple majority of membership interests. (*Id.*).

78. Christie's superficial analysis ignored the fact that Berman is designated as Chairman in the Operating Agreements, thus requiring an amendment, and she made no mention of Section 5.4(a)(xiii)'s specific requirement that

Operating Agreement amendments be approved by both a majority of managers and at least 75% of the membership interests.

79. Christie also ignored that, even in cases where Section 5.4(a) does not apply, the Operating Agreements expressly vest management authority in the Board, which is empowered to act only through an appropriate majority. (Ex. C §§ 5.1, 5.8, 5.9). Nothing in the Operating Agreements permits a member to bypass the Board and assume unilateral control over the Companies' decisions and actions, even with a majority of membership interests.

80. During the January 15, 2026 hearing on Plaintiffs' request for a status quo order, the Court recognized that Christie's interpretation was untenable. After confirming that amendments to the Operating Agreements are subject to the Heightened Approval Requirements, the Court remarked: "I don't know why general counsel would be taking the position that [Rajsic's action] was permissible given how plain that would seem to be." (Transcript of Telephonic Oral Argument on Plaintiffs' Motion to Expedite and Status Quo Order (Jan. 15, 2026) (hereinafter, "Jan. 15, 2026 Tr.") at 63:21–24). The Court's observation underscores the obvious: Christie's interpretation ignores the Operating Agreements' plain text to improperly allow Rajsic to bypass the Board's authority.

**F. <u>Rajsic Directs Millions of Dollars of Unauthorized Payments.</u>**

81. Rajsic has further wielded his self-anointed power and unauthorized control to enrich himself and his family and friends, including the Companies' officers who do his bidding.

82. Rajsic routinely uses the Companies' credit cards for personal expenses and has caused the Companies to pay him millions of dollars in unauthorized and/or improperly documented personal expense reimbursements. For years, Rajsic has treated the Companies' corporate credit cards as a personal slush fund, charging expenses that have no possible business purpose. Although these payments have continued since he became a manager in November 2024, they began earlier, as Rajsic had access to two Company credit cards and submitted expense reimbursements while serving as a consultant.

83. For example, since November 2024, Rajsic has caused the Companies to pay hundreds of thousands of dollars in "bonus" payments to a shell company controlled by his wife, with no services or benefits provided to the Companies in return.

84. Rajsic has also caused the Companies to pay hundreds of thousands of dollars in "bonus" payments to purported consultants who have no discernable connection to the Companies, including, on information and belief, women with

whom Rajsic is in romantic relationships. Examples of these payments include the following:

| | | |
|---|---|---|
| 06/27 | [redacted] | 4,000.00 |
| 07/31 | [redacted] | 4,000.00 |
| 09/23 | [redacted] | 3,000.00 |

85. For at least two years, Rajsic caused a recurring monthly stipend—typically $1,029—to be paid to his daughter, totaling $44,245. An example of such a charge is as follows:

| | | |
|---|---|---|
| 01/07 | [redacted] | 1,029.30 |

86. Rajsic also ran up charges for luxury goods, including $2,386 at Hermès in Chicago in May 2023; $948 at Salvatore Ferragamo in New York in September 2024; and multiple purchases at Harrods in London, including $410 in November 2024 and $1,827 in January 2025. The following charge is illustrative:

| | | |
|---|---|---|
| 05/13 | Hermes of Paris Chicago IL | 2,386.92 |

87. Rajsic also uses corporate funds for entertainment and leisure travel, including $6,800 for Broadway tickets in March 2023; a summer 2023 vacation in Ibiza totaling $4,964 (including $2,394 at the Ushuaia Hotel); and a September 2025

trip to Las Vegas that included hotel and entertainment charges and a $101.33 purchase at a cannabis dispensary. The following charges are again illustrative:

| | | |
|---|---|---|
| 09/11 | JARDIN 702-7702540 NV | 101.33 |
| 09/13 | PAR*FOGO CHICAGO CHICAGO IL | 693.51 |
| 09/11 | VEGAS BORN BURKE LAS LAS VEGAS NV | 60.00 |
| 09/13 | [redacted] | 185.52 |
| 09/11 | VEGAS BORN BURKE LAS LAS VEGAS NV | 16.87 |
| 09/11 | WYNN LAS VEGAS HOTEL/H LAS VEGAS NV | 4,013.46 |

88. Rajic has also charged personal medical and spa expenses to the Companies' credit cards, including fertility treatments in Serbia totaling $4,901 in July 2023 and $3,767 in August 2023; massage therapy in Chicago totaling $410 in May 2024; and luxury spa treatments in Serbia totaling $2,782 in May 2025 and $3,375 in June 2025.

89. Rajsic has further used his Company credit cards for household and discretionary purchases unrelated to any Sun Africa or UGTR business, including $734 at Zara Home and $3,092 at Dremco furniture for his personal residence; $2,214 at Okov Centar hardware in September 2024; and $1,641 in donations to an Orthodox church.

90. Rajsic also charges recurring subscriptions and lifestyle expenses to the Companies' credit cards, including Netflix, Paramount+, Uber, Uber Eats, and East Bank Club.

91. Most significantly, in December 2024, Rajsic directed the Companies to distribute approximately $2.1 million to him for personal reimbursements. When Berman sought appropriate backup documentation, Doyle stated that these reimbursements had been "documented about as well as any of us could expect from him." Nevertheless, Doyle wired payment to Rajsic the very same day.

92. In short, Rajsic has treated the Companies like his personal ATM. The charges highlighted above reflect just a fraction of the widespread misuse shown in the full account statements.

93. The Companies' officers, and in particular CFO Doyle, have blindly followed Rajsic's directives, causing the Companies to make these improper payments and reimbursements without conducting any investigation or verification, and without receiving proper documentation.

94. Berman and Krneta learned that many of these payments had been made only when they viewed the Companies' bank accounts and saw unexplained outgoing transfers.

95. Upon learning of the transfers, Berman and Krneta asked CFO Doyle to provide backup to help them understand the business purpose for these payments. Doyle never provided the documents.

96. Further, as discussed below, on July 31, 2025, Berman and Krneta followed up with a formal books and records demand, seeking to inspect the

contracts and correspondence relevant to these payments. At Rajsic's direction, they were again denied access to these records.

### G. Rajsic Denies Berman and Krneta Access to Company Information.

97. On July 31, 2025, Berman and Krneta, as managers, made formal books and records demands to inspect books and records needed to fulfill their fiduciary duties. (Ex. G).

98. Because Rajsic and the Companies' officers and employees routinely conduct business over WhatsApp, Berman and Krneta specifically requested these communications in their demand. (*Id.*).

99. Although GC Christie and CEO Cortese had already agreed Berman and Krneta should have full access to the Companies' records, Rajsic directed the Companies not to produce crucial documents, such as access to folders on the Companies' shared drives that contain key contracts, financial information, and operational information. (Exs. H & I).

100. At Rajsic's direction, the Companies refused to provide the documentation requested in Berman's and Krneta's books and records demand.

101. Plaintiffs made two additional formal books and records demands on October 16, 2025 and November 14, 2025, to no avail. (Exs. J & K).

102. Rajsic further excluded Berman and Krneta from information by directing Cortese to instruct employees not to communicate with Berman and Krneta about the Companies' matters. Cortese followed this instruction.

103. Without access to the Companies' books and records, Berman and Krneta cannot properly fulfill their fiduciary duties, including their duty to oversee how the Companies' funds are being spent—which no doubt is exactly what Rajsic intends.

104. During the January 20, 2026 hearing on Plaintiffs' request for a status quo order, Rajsic's counsel admitted that Plaintiffs are entitled to the books and records they have repeatedly requested, stating: "I don't think there's any disagreement that ultimately they get what Mr. Rajsic gets as far as information from the company for purposes of performing their duties as managers." (Transcript of Telephonic Status Conference Re Status Quo Order (Jan. 20, 2026) (hereinafter, "Jan. 20, 2026 Tr.") at 35:14–17). Notwithstanding this concession, and despite Plaintiffs' subsequent follow-up, the Companies still have not produced the requested documents. To the contrary, following the hearing, Defendants escalated their obstruction by removing Plaintiffs' access to certain of the Companies' accounts.

### H. Rajsic Exerts Unauthorized Control Over Other Company Resources, Including the Companies' Counsel.

105. As part of his unauthorized dominion over the Companies' resources, Rajsic has also hijacked the Companies' in-house counsel (Christie). Rather than act at the direction of the Board and for the benefit of the Companies, the Companies' counsel has taken direction only from Rajsic.

106. As noted above, Christie, who is beholden to Rajsic, issued a patently flawed legal opinion endorsing Rajsic's ability to act unilaterally as the majority member as long as the action is not specifically enumerated in Section 5.4(a)—an interpretation that wholly ignores the role of the Board and the plain language of the Operating Agreements. (*See* Ex. F). On information and belief, Christie issued this opinion at Rajsic's direction and for the purpose of furthering her self-interested goal of maintaining Rajsic's control of the Companies, irrespective of Berman's and Krneta's rights as managers.

107. Because Berman and Krneta are managers, any legal advice requested of or provided by Christie or any other attorney purporting to represent the Companies is not privileged vis-à-vis Berman and Krneta, who as managers are joint clients and are entitled to equal access to the Companies' resources.

## I. Rajsic Holds the Companies' Distributions Hostage.

108. Rajsic's most recent power grab has been to hold hostage millions of dollars of mandatory distributions in an effort to pressure Berman and Krneta to break the Board deadlock and submit to Rajsic's total control.

109. Section 4.1 of the Operating Agreements requires the Companies to make quarterly distributions to the members of available cash (the "Distributions"). It states that, "within forty-five (45) days after the end of each … quarter, at least twenty percent (20%) of the Cash Available for Distribution (as determined by the Board and after taking into account any Tax Distributions for such quarter) as of the end of such quarter shall be distributed to the [members]" (the "Distributions"). (Ex. C § 4.1).

110. The term "Cash Available for Distribution" is defined to mean, "with respect to any period, all cash receipts and funds received by the Company (except for Capital Contributions and borrowings) minus: (i) all cash expenditures; and (ii) the Company's cash representing working capital or other reserves as determined by the Board, assuming for such purposes that Tax Distributions actually made are cash expenditures of the Company and that Tax Distributions to be made are to be included in reserves."

111. Section 4.1(a) further requires the Companies to make quarterly tax distributions (the "Tax Distributions") calculated by a specific formula: allocated taxable income multiplied by the maximum Chicago tax rate. (*Id*. § 4.1(a)). It states:

> Notwithstanding [the prior paragraph] to the contrary, the Company (without the requirement of Board approval) shall use reasonable efforts, subject to applicable covenants and restrictions contained in the Company's loan agreements and other obligations to which the Company or its properties are subject, to cause the Company to distribute to the members with respect to each fiscal year of the Company (such amounts to be distributed on a quarterly basis, taking into account reasonable estimates of income over the course of the entire fiscal year) an amount in cash which in the good faith judgment of the CEO equals (i) the amount of taxable income allocable to the members in respect of such fiscal year, multiplied by (ii) the combined maximum federal, state and local income tax rate applicable to an individual resident of Chicago with respect to such taxable income (taking into account the deductibility of state and local income tax for federal income tax purposes).

(*Id*.).

112. The formula in Section 4.1(a) is mandatory and mechanical, requiring Tax Distributions to be calculated by multiplying taxable income by the applicable tax rate. There is no dispute over either input to this formula. The Form K-1s issued by the Companies indicate that, for 2024, the Companies allocated $2,298,951 in taxable income to Mainstream; $2,975,113 in taxable income to The RJB Trust; and $5,544,530 in taxable income to Abacus (which at that time was owned by

Mainstream). (Ex. L).[2] The applicable combined tax rate for a resident of Chicago is likewise an objective fact that requires no discretion to ascertain.

113. Section 4.1(a) further states that Tax Distributions "shall be paid to the members at least five days prior to the applicable due date of the estimated quarterly federal income tax payment in question." (Ex. C § 4.1(a)).

114. At the end of 2024, the Companies experienced a large liquidity event, infusing the Companies with cash that could have been used to make Distributions under Section 4.1, and creating taxable income that triggered an obligation under Section 4.1(a) to make a Tax Distribution.

115. The Distribution of available cash was due by February 15, 2025, forty five days after the end of the quarter in which the cash was received.

116. The Tax Distribution was due by no later than January 10, 2025, five days before the January 15, 2025 estimated tax payment deadline. Applying the formula in Section 4.1(a) of the Operating Agreements, the Tax Distribution due to Mainstream for 2024 is approximately $3.5 million, and the Tax Distribution due to The RJB Trust for 2024 is approximately $1.6 million.

117. Despite the mandatory requirements of Sections 4.1 and 4.1(a), the Companies did not make the required Distributions or Tax Distributions.

[2] Sun Africa and UGTR file one federal tax return as they operate as a single enterprise.

118. At the March 31, 2025 Board meeting, Berman and Krneta raised the issue of the unpaid Tax Distributions and the question of additional Distributions of available cash. In response, Rajsic grew irate. He compared himself to Elon Musk and insisted that he deserves a pay package similar to the $56 billion pay package approved by the Tesla Board. Rajsic then declared that, unless Berman and Krneta signed the previously provided documentation to grant him a 75% membership interest in and complete control over the Companies, Rajsic would not authorize any Distributions, including Tax Distributions. Rajsic warned Berman and Krneta that they "won't see a cent" unless and until they acceded to his demand and delivered the additional equity.

119. On April 15, 2025, Berman wrote to Rajsic, acknowledging Rajsic's efforts but noting that "the tone of our relationship in recent months has been damaging." Berman proposed "that we both put a stop to this" and instead "focus[] on the work and value we've creating, not letting conflict undermine it." (Ex. M).

120. Rajsic rejected "[t]he so-called proposal," calling it an "absolute non-starter" and writing:

> I was very clear that until I am made whole in a respectful and equitable manner there will be no distributions of any kind to the members. . . .
>
> [U]ntil this is resolved to what was promised there will be no distribution. I am ready to do immediately after what was promised is delivered unconditionally (and I mean it).

(*Id.*).

121. The deliverable Rajsic claimed to have been "promised" was the additional equity he demanded due to his purported Musk-like efforts for the Companies. Contrary to his statement, no such equity or other compensation was ever promised to him.

122. Thereafter, Berman and Krneta continued to demand payment of the Tax Distributions, including in a June 19, 2025 letter to GC Christie. Rajsic, however, continued to block such payments. By letter dated June 20, 2025, Rajsic's personal attorney, Ed Patricoff, wrote a letter to GC Christie stating that "Abacus opposes such Tax Distributions" and claiming, among other things, that the Companies should reduce the taxable income applicable to the members by their prior-year losses—a position that conveniently reduced the Tax Distributions owed to Mainstream and Berman by 90% and 70%, respectively.

123. Because Rajsic did not obtain control over Abacus until November 2024, he has minimal tax liability for 2024 and thus is not negatively impacted by his insistence on applying prior-year tax losses to reduce taxable income for 2024.

124. Predictably, Cortese has fallen in line with Rajsic's decree. By letter dated October 6, 2025 letter, Cortese indicated that he would authorize Tax Distributions of only approximately $273,000 to Mainstream; approximately $354,000 to The RJB Trust; and approximately $660,000 to Abacus. (Ex. N). These

amounts represent less than 8% of the Tax Distribution actually due to Mainstream, and approximately 20% of the Tax Distribution actually due to The RJB Trust.

125. As set forth in his October 6 letter, Cortese adopted Abacus's position that prior-year losses should be applied when determining taxable income for each member, even though no such requirement exists in the Operating Agreements. (*Id.*).

126. The Operating Agreements require the payment of quarterly tax distributions tied to "taxable income allocable … in respect of such ***fiscal year***," not cumulatively based on prior fiscal years. (Ex. C § 4.1(a) (emphasis added)). If the members had wanted Tax Distributions to be paid based on cumulative income that took into account prior-year losses, they would have said so, but no such language appears in the Operating Agreements.

127. Cortese further claimed that Tax Distributions should be reduced due to liquidity considerations. Tellingly, Cortese did not claim that the Companies lacked sufficient funds to make the required Tax Distributions. Instead, he expressed an interest in "maintain[ing] sufficient cash on hand to ensure continuity for at least a twelve-month period." (Ex. N).

128. That liquidity claim was manufactured to overstate the Companies' cash needs. Doyle prepared an initial budget for the Companies but refused to provide it to Berman until Cortese approved it. Cortese then rewrote the budget

himself, inflated projected cash requirements, and used the revised figures as a pretext to withhold the Tax Distributions.

129. In any event, the excuse is contrary to the Operating Agreements, which provide no adjustment to the formula set forth in Section 4.1(a) for the Companies' purported cash needs. Rather, the provision sets a fixed, mechanical calculation—each member's taxable income for the fiscal year multiplied by the combined maximum Chicago tax rate. It allows no discretion to reduce payment based on supposed preferences about the Companies' liquidity. To the extent there is a liquidity concern, it is to be addressed by the Board (not the CEO) when determining Cash Available for Distribution under Section 4.1.

130. At the January 15, 2026 hearing, the Court provided its view of Defendants' argument that alleged "cash needs" permit nonpayment, emphasizing that Section 4.1(a) sets out a "mechanical analysis," determined by "an amount of cash which in the good-faith judgment of the CEO equals (i) and (ii)"—*i.e.*, the member's allocable taxable income multiplied by the specified rate. (Jan. 15, 2026 Tr. 46:18–20, 47:3–4). The Court further reiterated that "Section 4.1(a) is mandatory" and "the CEO cannot … act in bad faith to withhold tax distributions." *(Id*. at 41:8–9, 41:18–19).

131. Cortese's reliance on the clause in Section 4.1(a) making payment "subject to applicable covenants and restrictions contained in the Company's loan

agreements and other obligations to which the Company or its properties are subject" is also misplaced. As the Court explained, the reference to "obligations" in this clause is "tied to covenants and restrictions," "not just a sort of free floating reference to obligations," and pertains to actual contractual constraints (like "debt instruments that aren't necessarily loan agreements"), not management's cash targets. *(Id*. at 44:1–3, 44:20–21).

132. Cortese's supposed concern over liquidity is a pretext designed to facilitate Rajsic's extortionate demand for more equity by withholding Distributions. As of early February 2026, the Companies hold approximately $30 million in their operating accounts. The Companies' operating expenses are far less than this amount, and there is no liquidity issue created by paying the Tax Distributions in full. There is also sufficient cash to make other mandatory Distributions pursuant to Section 4.1 of the Operating Agreements.

133. Defendants have also manipulated the Companies' financials to personally benefit Rajsic and further harm Berman and Krneta. The Companies' substantial cash reserves include approximately $18 million in development fees from Omatapalo for solar development work completed in Angola in November 2025. Rather than receive this payment in 2025, the Companies requested that Omatapalo defer payment until January 2, 2026. CFO Doyle explained this deferral strategy in a December 16, 2025 email to Krneta, noting that the Companies deferred

the $18 million payment "so that the revenue would not show up in 2025's financials (and therefore increase the members' tax liability for the year)." (Ex. P).

134. While deferring this $18 million payment, the Companies simultaneously paid hundreds of thousands of dollars of discretionary year-end bonuses in December 2025 without Board approval or knowledge. Doyle explained: "Paying bonuses now in connection with this will also help to reduce net income for the year, as the additional expenses associated with this can be recognized now while the future revenue is deferred." (*Id.*).

135. Cortese's employment agreement authorizes a bonus to him only at quarter-end or when member distributions are made. In 2025, Cortese paid himself approximately $1.3 million in bonuses while simultaneously blocking required distributions to the members.

136. Any supposed concern over liquidity is also refuted by the Companies' hundreds of thousands of dollars gratuitously paid to Rajsic's wife, daughter, romantic partners, and various random "consultants" who, on information and belief, have provided no services to the Companies.

137. Since taking control of Abacus, Rajsic, with the assistance of Cortese, has blocked the Companies from paying any Distributions whatsoever, other than the minimal Tax Distributions authorized by Cortese in October 2025.

138. Defendants' refusal to make the required Distributions constitutes a breach of the Operating Agreements and defeats the core purpose of Section 4.1(a), which is to ensure members can pay taxes on income allocated to them by the Companies. Members have no control over the amount of taxable income allocated to them, yet they bear personal liability for taxes on that income. Section 4.1(a) exists precisely to prevent the inequitable result Rajsic and Cortese have created—forcing members to pay taxes on allocated income while refusing to distribute funds to cover those tax obligations.

139. To add insult to injury, Rajsic has taken the extreme position that he can keep the $660,000 Tax Distribution paid to Abacus in October 2025, even though that distribution relates to a tax liability incurred prior to November 2024, when Abacus was controlled by Krneta—a liability that passed through to Krneta. In other words, it is not enough for Rajsic to financially harm Berman and Krneta by withholding the Tax Distributions, he also wants to affirmatively benefit through a windfall payment for a pass-through liability he never incurred.

140. Abacus has admitted it owes these funds to Mainstream. By letter dated October 9, 2025, Abacus sent a letter offering to transfer to Mainstream the "entirety" of the $660,000 Tax Distribution it received "given that Mainstream … owned Abacus in 2024 during which income was allocated from Sun Africa." (Ex. O). However, Abacus wrongfully conditioned this transfer on Mainstream agreeing

to execute a "global release" of all claims against Abacus, Rajsic, and their affiliates. (*Id.*).

141. Rajsic knows that withholding the Tax Distributions creates significant financial pressure on Berman and Krneta, who face mounting IRS penalties and interest. This deliberate refusal is financial extortion designed to coerce Berman and Krneta into surrendering their governance rights and acquiescing to Rajsic's demand for 75% of the Companies' equity.

142. Rajsic's tactic, while putting pressure on Berman and Krneta, costs Rajsic nothing. Because he did not own Abacus prior to November 2024, he has minimal tax exposure for the 2024 tax year, allowing him to weaponize the Companies' tax liabilities against Berman and Krneta while suffering no parallel consequences.

143. Rajsic's position is contrary to the Transfer Agreement: Section 2 requires Denou (which Rajsic controls) to indemnify Mainstream for all tax consequences relating to the period when Mainstream owned Abacus (January 1, 2024 through November 11, 2024). (Ex. B § 2). Rajsic and Denou have refused to do so.

**J. <u>Rajsic's Ownership and Control of Denou.</u>**

144. Rajsic controls and beneficially owns Denou, an offshore entity Rajsic uses to render himself judgment-proof and avoid complying with contractual and legal payment obligations.

145. In 2011, the State of Illinois brought two indictments charging Rajsic with thirteen crimes involving schemes to defraud two insurance companies and further alleged four not-yet-charged crimes involving a third insurance company. (Ex. Q ¶¶ 5, 6, 11). On January 18, 2012, Rajsic pleaded guilty to three felony counts of forgery and admitted that he "knowingly executed a scheme to defraud" the three insurance companies. (*Id.* ¶ 13). Rajsic served more than one year in prison for these crimes.

146. On November 9, 2012, one of the insurance companies obtained summary judgment against Rajsic in the amount of $3,251,331.82. On August 19, 2014, Rajsic filed for Chapter 7 bankruptcy in the Bankruptcy Court of the Southern District of Florida. The bankruptcy court, however, denied Rajsic discharge and entered judgment on July 28, 2016, which was affirmed by the District Court on May 16, 2017. In affirming the judgment, the District Court cited Rajsic's admission that he "knowingly executed a scheme to defraud" and explained that "[t]hese actions indicate fraud that involves moral turpitude or intentional wrong and include

knowing deceit used to circumvent and cheat another." *Rajsic v. Valley Forge Ins. Co.*, 574 B.R. 312, 315, 319 (S.D. Fla. 2017).

147. Given the outstanding judgment against him—which on information and belief now amounts to more than $7 million—Rajsic has deliberately divested himself of all "official" ownership of U.S. assets, including by appointing his childhood friend, Nenad Borojevic, as the "legal" owner of Denou.

148. Rajsic has falsely claimed—including to the Companies' bank—that Borojevic is the ultimate beneficial owner of Denou. In fact, Borojevic is a strawman, and Rajsic beneficially owns and controls Denou. As compensation for acting as Rajsic's strawman, Rajsic has caused the Companies to employ Borojevic as an "office manager" in Serbia. In reality, Borojevic gets paid between $4,000 and $6,000 per month to drive and run errands for Rajsic.

### K. Cortese Improperly Offloads His Legal Expenses onto the Companies.

149. After the dispute among the managers escalated, Cortese caused the Companies to retain outside counsel and informed Plaintiffs that the same law firms would represent both the Companies and Cortese personally in this litigation. Plaintiffs objected because dual representation created a conflict: as members and managers, Plaintiffs are joint clients of the Companies' counsel, which cannot remain neutral if it simultaneously represents Cortese personally. Dual

representation also ensures that any allocation of legal fees between Company work and Cortese's personal defense would be opaque and prone to further conflict. Cortese nevertheless dismissed Plaintiffs' concerns.

150. Because of this conflict, however, and because Cortese asserted that he was entitled to mandatory advancement of his personal litigation expenses, the parties discussed implementing a *Fitracks* procedure to ensure proper review and allocation of fees incurred in connection with Cortese's defense. In fact, in their proposed status quo order submitted to the Court, Defendants included a provision requiring the parties to confer regarding an appropriate *Fitracks* order.

151. During the January 20, 2026 hearing, Defendants' counsel repeatedly confirmed that a *Fitracks* procedure was appropriate. (*See* Jan. 20, 2026 Tr. 28:14–20 ("Counsel just said that, you know, Mr. Cortese should not be approving his own invoices … And look, we have no issue with that. That's why we proposed—or I guess counsel says correctly they proposed a *Fitracks* process first, and we have no issue with it."); *id.* at 31:17–21 ("We have no objection to it. We felt … a *Fitracks* order would streamline the process and allow any disputes to be teed up for the Court's consideration promptly."); *id.* at 32:6–9 ("I thought this was one area where the parties had agreed that a *Fitracks* order made sense here concerning the advancement of defendants' attorneys' fees."); *id.* at 32:21–24 ("I think, where the parties agree, the *Fitracks* order. And I think the parties agreed to this as a way of

just taking this off the table as an issue the Court has to decide."); *id.* at 33:6–10 ("[I]t's very easy to have a *Fitracks* order in place, and then they're protected from unreasonable fees. So I think we're in agreement there; I can take that off the table.")).

152. Based on these representations, the Court concluded that "it sounds as though everyone is in agreement to including a *Fitracks* order." (*Id.* at 43:14–16). Accordingly, the status quo order entered by the Court directed the parties to confer regarding an appropriate *Fitracks* order.

153. However, rather than comply with the status quo order, Cortese has manufactured a scheme to avoid any oversight of Cortese's legal fees and ensure that the Companies bear the full financial burden of Cortese's defense. On January 27, 2026, counsel for the Companies and Cortese informed Plaintiffs:

> [W]e do not believe Plaintiffs' consent is required for the payment of the Companies' attorneys' fees or mandatory advancement of Mr. Cortese's attorneys' fees and costs in this action. … [A]t present, little or no work has been undertaken solely for Mr. Cortese's benefit; rather, all of the work to date has been undertaken for and has benefited the Companies and would have been performed even if Mr. Cortese were not a defendant. … [G]iven that we do not expect the fees or expenses solely attributable to Mr. Cortese will be significant, we do not believe it makes sense to burden the parties or the Court with a *Fitracks* procedure at this time.

154. By characterizing all litigation work as work "for the Companies" rather than for Cortese personally—even though Plaintiffs' claims concern his misconduct—Cortese is shifting his legal fees to the Companies, and avoiding the undertaking to repay them, regardless of whether the work is performed for his individual defense. At the same time, he seeks to evade any oversight by claiming that a *Fitracks* procedure is unnecessary. Instead, Cortese proposes to provide only the cover sheets of his attorneys' invoices—without time entries necessary to assess allocation or reasonableness—along with a certification from GC Christie—who reports to Cortese—stating "that the invoices will be reviewed and processed in the same manner as outside litigation counsel invoices are in connection with other proceedings."

155. Defendants' approach would eliminate any Board or judicial oversight and leave Cortese effectively free to spend Company funds on his personal defense without constraint. The scheme enables Cortese to effectively grant himself advancement without providing the mandatory undertaking to repay such amounts if indemnification is unwarranted and without any review for reasonableness. It is an end-run around the protections built into the Operating Agreements and Delaware law. It also ignores the checks and balances inherent in the *Fitracks* process that Cortese himself agreed to weeks ago.

## COUNT I
## (Declaratory Judgment—6 *Del. C.* § 18-110 and/or 10 *Del. C.* § 6501 *et seq.*)
## Against Rajsic and Cortese and
## Against Sun Africa and UGTR as Nominal Defendants

156. Plaintiffs incorporate and reallege paragraphs 1 through 155 above as if set forth in full herein.

157. The Operating Agreements are valid and enforceable contracts and establish clear governance requirements under Article V, vesting the authority to manage the Companies with the Board, authorizing the Board to act only through a proper majority, and requiring the approval of at least 75% of the membership interests for certain enumerated actions.

158. Notwithstanding the plain language of the Operating Agreements, Rajsic and Cortese have denied Berman and Krneta their legal right as managers to participate in the management of the Companies and have instead taken the position that they can unilaterally make decisions affecting the Companies without Board oversight or approval.

159. Specifically, Rajsic has asserted that, as the controller of Abacus's majority membership interest in the Companies, he may act unilaterally on any matter not expressly listed in Section 5.4(a) of the Operating Agreements, including unilaterally amending the Operating Agreements.

160. The Companies' officers, including CEO Cortese, have carried out Rajsic's unilateral directives, improperly bypassing the Board and excluding Berman and Krneta from management, in violation of Berman's and Krneta's rights as managers under the Operating Agreements and Delaware law. GC Christie has also issued a patently flawed legal opinion purporting to endorse Rajsic's and Abacus's power to act unilaterally as the majority member.

161. Since the filing of this action, Defendants have advanced a new theory, claiming that Cortese, as CEO, may act unilaterally on any matter not expressly listed in Section 5.4(a).

162. In reality, Cortese continues to take direction from Rajsic, using his role as CEO as the pretext to implement Rajsic's unilateral directives.

163. Defendants' assertions of authority are inconsistent with the Operating Agreements, which establish manager-managed limited liability companies that are governed by a four-person Board. Nothing in the Operating Agreements allows the Companies to be governed by the majority member, even when the Board is deadlocked. Likewise, though the Operating Agreements delegate certain day-to-day tasks to the Companies' officers, those officers—including the CEO—remain subject to the control and direction of the Board, even when there is a Board deadlock.

164. An actual, justiciable controversy exists concerning the parties' respective rights and obligations in connection with the management of the Companies.

165. This dispute is ripe for judicial determination. Plaintiffs contend that Rajsic and Cortese have denied Berman and Krneta their legal right to participate in the management of the Companies and have unilaterally made decisions affecting the Companies without proper oversight in violation of the Operating Agreements. Rajsic and Cortese contend that they may continue to direct and run the Companies without appropriate Board oversight or approval.

166. A declaration is necessary to resolve who has authority to manage the Companies and what processes and approvals the Operating Agreements require for Company action. Prompt resolution will restore the clear decision-making framework required by the Operating Agreements; reduce the risk of additional unauthorized transactions and the need to unwind actions taken during the governance deadlock; and avoid additional, costly disputes over authority. A declaratory judgment will clarify the parties' rights and terminate the controversy.

167. Accordingly, Plaintiffs seek a declaration under 6 *Del. C.* § 18-110 and/or under 10 *Del. C.* § 6501 *et seq*. Among other things, Plaintiffs are entitled to a declaration that:

(a) All actions by or on behalf of the Companies are subject to the control and oversight of the Board, and all actions other than day-to-day actions delegated to the CEO further require the affirmative approval of the Board acting through either a majority of the managers or, where applicable, a majority of the managers present at a duly called and properly quorumed meeting;

(b) Neither Abacus nor Rajsic has authority to unilaterally take or cause to be taken any action on behalf of the Companies, regardless of whether or not such action is enumerated in Section 5.4(a) of the Operating Agreements or constitutes a day-to-day action;

(c) Cortese has no authority to take or cause to be taken any action on behalf of the Companies without proper Board approval and/or oversight, regardless of whether or not such action is enumerated in Section 5.4(a) of the Operating Agreements or constitutes a day-to-day action. Cortese's authority as CEO is limited to the supervision of the day-to-day management and operations of the Companies. He has no right to unilaterally act or make decisions for the Companies on non-day-to-day matters, and he remains subject to the control of the Board on all matters, including day-to-day matters;

(d) Day-to-day matters are not limited to those actions enumerated in Section 5.4(a);

(e) The Companies' officers and agents may not act at the unilateral direction of Abacus or Rajsic on any matters, and may not act at the unilateral direction of Cortese except with respect to day-to-day matters;

(f) As managers, Berman and Krneta are entitled to unfettered access to the Companies' books and records, including without limitation all documents and communications to which the other managers have access; and

(g) Berman remains Chairman of the Companies, unless duly removed and replaced by the approval of the Board acting through a majority of the managers and at least 75% of the membership interests.

168. Plaintiffs further request a declaration that all actions taken by or on behalf of the Companies from November 11, 2024 to the present without proper approval of the Board and, where applicable, at least 75% of the membership interests, are null and void unless ratified by the Board, and that Rajsic and Cortese should reimburse the Companies for all unauthorized payments.

169. Plaintiffs have no adequate remedy at law.

**COUNT II**
**(Declaratory Judgment Under 6 *Del. C.* § 18-111)**
**Against Rajsic and Cortese and**
**Against Sun Africa and UGTR as Nominal Defendants**

170. Plaintiffs incorporate and reallege paragraphs 1 through 155 above as if set forth in full herein.

171. The Operating Agreements are valid and enforceable contracts and establish clear governance requirements under Article V, vesting the authority to manage the Companies with the Board, authorizing the Board to act only through a proper majority, and requiring the approval of at least 75% of the membership interests for certain enumerated actions.

172. Notwithstanding the plain language of the Operating Agreements, Rajsic and Cortese have denied Berman and Krneta their legal right as managers to participate in the management of the Companies and have instead taken the position that they can unilaterally make decisions affecting the Companies without Board oversight or approval.

173. Specifically, Rajsic has asserted that, as the controller of Abacus's majority membership interest in the Companies, he may act unilaterally on any matter not expressly listed in Section 5.4(a) of the Operating Agreements, including unilaterally amending the Operating Agreements.

174. Since the filing of this action, Defendants have advanced a new theory, claiming that Cortese, as CEO, may act unilaterally on any matter not expressly listed in Section 5.4(a).

175. Defendants' interpretations are inconsistent with the Operating Agreements, which establish manager-managed limited liability companies that are governed by a four-person Board. Nothing in the Operating Agreements allows the Companies to be governed by the majority member, even when the Board is deadlocked. Likewise, though the Operating Agreements delegate certain day-to-day tasks to the Companies' officers, those officers—including the CEO—remain subject to the control and direction of the Board, even when there is a Board deadlock.

176. Accordingly, Plaintiffs seek a declaration of their rights as members and managers of the Companies under 6 *Del. C.* § 18-111.

177. Plaintiffs further request a declaration that all actions taken by or on behalf of the Companies from November 11, 2024 to the present without proper approval of the Board and, where applicable, at least 75% of the membership interests, are null and void unless ratified by the Board, and that Rajsic and Cortese should reimburse the Companies for all unauthorized payments.

178. Plaintiffs have no adequate remedy at law.

**COUNT III**
**(Breach of Contract—Operating Agreements)**
**Against Sun Africa, UGTR, and Cortese**

179. Plaintiffs incorporate by reference paragraphs 1 through 155 above.

180. The Operating Agreements are valid and binding contractual agreements among the members and managers of the Companies.

181. 6 *Del. C.* § 18-101(9) provides that "[a] member or manager of a limited liability company or an assignee of a limited liability company interest is bound by the limited liability company agreement whether or not the member or manager or assignee executes the limited liability company agreement."

182. Section 4.1 of the Operating Agreements requires the Companies to make quarterly Distributions of available cash, in an amount no less than 20% of the Cash Available for Distribution, to the members, with such Distributions due within forty-five days after the end of each quarter.

183. Section 4.1(a) of the Operating Agreements further requires the Companies to make quarterly Tax Distributions to the members pursuant to a specific, mandatory formula that multiplies allocated taxable income by the maximum Chicago tax rate, and to make such Tax Distribution at least five days prior to the quarterly estimated tax payment deadline.

184. The Companies have failed to make the Distributions required by Section 4.1, despite having sufficient cash available for distribution.

185. The Companies have also failed to pay the Tax Distributions required by Section 4.1(a). The Companies generated substantial income for 2024 and 2025 that was allocated to the members. There is no dispute regarding the inputs to the Section 4.1(a) formula. Nevertheless, the Companies, acting at the direction of Rajsic and Cortese, have refused to make the required payments.

186. By letter dated October 6, 2025, Cortese asserted that prior-year losses should be applied when determining taxable income for each member, even though Section 4.1(a) requires calculating Tax Distributions based on "taxable income allocable to the members in respect of ***such fiscal year***," not cumulatively based on prior fiscal years.

187. Cortese also claimed that Tax Distributions should be reduced based on the Companies' liquidity considerations. That position is likewise inconsistent with Section 4.1(a), which supplies a fixed, mechanical calculation and permits deviation only to the extent of actual "covenants and restrictions" in the Companies' debt instruments and other such binding obligations—not management's supposed cash targets.

188. These shifting rationales are pretextual and do not excuse nonpayment. Section 4.1(a) sets the amount of Tax Distributions by a mechanical formula and mandates payment on the schedule stated. Reference to the CEO's "good faith

judgment" concerns calculating the inputs to the formula, not the power to withhold or reduce payments for any other reason.

189. The Companies' and Cortese's nonpayment resulted from an improper effort, engineered by Rajsic and carried out through Cortese, to extort Berman and Krneta into acquiescing to Rajsic's total control of the Companies, including the surrender of their equity. Defendants know that withholding the Tax Distributions creates significant financial pressure on Plaintiffs, who face mounting IRS penalties and interest.

190. The Companies' and Cortese's refusal to make the required Tax Distributions constitutes a breach of the Operating Agreements**.**

191. As a direct result of the Companies' and Cortese's breaches, Plaintiffs have suffered damages.

**COUNT IV**
**(Direct Claim for Breach of Fiduciary Duty)**
**Against Rajsic, Cortese, and Abacus**

192. Plaintiffs incorporate by reference paragraphs 1 through 155 above.

193. Rajsic and Cortese, as managers of Delaware limited liability companies, owe the common law fiduciary duties of loyalty and good faith to the Companies and their members, including Mainstream and The RJB Trust. As the majority member, Abacus likewise owes the common law fiduciary duties of loyalty and good faith to the Companies and their members.

194. Rajsic, Cortese, and Abacus have breached their fiduciary duties to Mainstream and The RJB Trust by, among other things, improperly blocking millions of dollars of Distributions unless Berman and Krneta meet Rajsic's extortionate demand to grant him a 75% membership interest in and complete control over the Companies.

195. Cortese has aligned himself with Rajsic and refused to cause the Companies to make the required Tax Distributions. To advance Rajsic's extortionate scheme, Cortese has invented false and pretextual claims about supposed liquidity constraints and the need to offset prior-year losses when calculating each member's taxable income. Neither rationale permits nonpayment under the Operating Agreements, and Cortese invented these excuses not in a proper exercise of his good faith judgment or obligations but rather as part of a bad faith effort to assist in Rajsic's scheme to extort Plaintiffs into giving up control over the Companies.

196. Abacus has also breached its fiduciary duties. As the 51.25% member, Abacus's vote is required to make Distributions, which are subject to the Heightened Approval Requirements. Rajsic, however, has made clear that he will use Abacus's 51.25% interest to block Distributions, furthering Rajsic's extortionate scheme to financially pressure Plaintiffs into ceding control.

197. Rajsic, Cortese, and Abacus have further breached their fiduciary duties by ensuring that what little amount of Tax Distributions has been authorized was

paid to Abacus, which is now controlled by Rajsic. Abacus has wrongfully refused to remit these funds to Mainstream even though the corresponding tax liability related to a period when Abacus was controlled by Mainstream and thus created pass-through tax liabilities for Mainstream and Krneta—not Abacus or Rajsic. Abacus has admitted that these funds are owed to Mainstream but has wrongfully demanded that Mainstream and Krneta sign a release before transferring the funds.

198. Rajsic's, Cortese's, and Abacus's breaches of fiduciary duty constitute willful neglect, gross negligence, and/or fraud.

199. As a direct result of Rajsic's Cortese's, and Abacus's breaches of fiduciary duty, Plaintiffs have suffered damages.

**<u>COUNT V</u>**
**(Derivative Claim for Breach of Fiduciary Duty)**
**Against Rajsic, Cortese, and Doyle**

200. Plaintiffs incorporate by reference paragraphs 1 through 155 above.

201. Rajsic and Cortese, as managers of Delaware limited liability companies, owe the common law fiduciary duties of loyalty and good faith to the Companies, including the duties to act in the Companies' best interests and refrain from self-dealing. As an officer (CFO), Doyle likewise owes the common law fiduciary duties of loyalty and good faith to the Companies, including a duty to ensure that the Companies' funds are expended only for legitimate Company purposes and with required approvals.

202. Rajsic has breached his fiduciary duties to the Companies by, among other things, (i) causing or directing improper payments of the Companies' funds for personal expenses, including through use of the Companies' credit cards, and (ii) causing or directing improper payments of purported "bonus" or "consulting" payments to his wife, daughter, romantic partners, and other related parties with no services or benefits to the Companies and without Board approval or adequate documentation.

203. Doyle has breached his fiduciary duties to the Companies by, among other things, approving or facilitating the payment of personal and non-business expenditures to benefit Rajsic, his family, and other related parties without any legitimate business purpose, without Board authorization, and without adequate supporting documentation. By rubber stamping and/or failing to conduct any meaningful review of these improper payments, including after Berman and Krneta asked him to provide backup to help them understand the business purpose for these payments, Doyle has abdicated his duty to verify the Companies' expenditures and has enabled the continued misuse of the Companies' funds.

204. Rajsic also breached his fiduciary duties by usurping corporate opportunities that belong to the Companies. Sun Africa conducts business in Nigeria through a wholly owned subsidiary. Recently, Plaintiffs learned that Rajsic caused the formation of a separate entity, Sun Africa Infrastructure Nigeria Limited, which

uses the Companies' name but is solely owned by Gabin Adantchede Koucoi—not Sun Africa. Koucoi is an employee in Sun Africa's Nigeria office and, on information and belief, is a straw owner acting at Rajsic's direction.

205. In addition, Rajsic, together with Koucoi and another Serbian associate, have formed another separate entity in Nigeria called Enersun Renew Limited ("Enersun"). On information and belief, Sun Africa Infrastructure Nigeria Limited and Enersun pursue the same line of business and the same types of projects as Sun Africa.

206. On information and belief, Rajsic diverted to those entities opportunities that rightfully belonged to Sun Africa. The Companies had a reasonable expectancy and interest in these improperly diverted opportunities. At all relevant times, the Companies were financially able to exploit those opportunities, as they were diverted to Rajsic's entities while Sun Africa was pursing business opportunities in Nigeria.

207. Rather than present these opportunities to the Companies, Rajsic concealed the ownership and purpose of his outside entities, and has even affirmatively misrepresented to the Companies' bank that Sun Africa Infrastructure Nigeria Limited is a wholly owned subsidiary of Sun Africa. By using these entities to capture opportunities for himself, Rajsic placed himself in a position inimical to his duties to the Companies.

208. Cortese has breached his fiduciary duties to the Companies by, among other things, shifting the cost of his personal legal defense onto the Companies, mischaracterizing that work as Company work when it is not, and attempting to evade oversight of those fees through a review by GC Christie, who reports to Cortese and is therefore conflicted.

209. Rajsic's, Cortese's, and Doyle's breaches of fiduciary duty constitute willful neglect, gross negligence, and/or fraud.

210. As a direct result of Rajsic's, Cortese's, and Doyle's breaches of fiduciary duty, the Companies have suffered damages.

211. Plaintiffs bring this claim derivatively on behalf of the Companies to redress injuries that the Companies have suffered as a result of Rajsic's, Cortese's, and Doyle's actions. Plaintiffs have not made a pre-suit demand on the Companies, as any "effort to cause those managers or members to bring the action is not likely to succeed." 6 *Del. C.* § 18-1001. Two of the four managers are interested, lack independence, and face a substantial likelihood of liability on the claims a demand would present. Pre-suit demand is therefore futile and excused as a matter of law.

212. Plaintiffs will adequately and fairly represent the interests of the Companies in enforcing and prosecuting their rights.

213. Rajsic is an interested manager and faces a substantial likelihood of liability. As alleged herein, Rajsic has usurped Board authority by declaring he can

act unilaterally as the majority member and by taking or causing to be taken various unilateral actions in breach of the Operating Agreements and in violation of his fiduciary duties under Delaware law. These actions include but are not limited to directing and accepting unauthorized cash payments and improper expense reimbursements to himself and his friends and family; improperly blocking the other managers' access to books and records and causing the Companies' employees not to communicate with Berman and Krneta; and holding the Distributions owed to Plaintiffs hostage to coerce a transfer of control and greater equity to himself, while directing a Tax Distribution to Abacus and refusing to pay those funds to Mainstream, which incurred the pass-through liability. These actions materially benefited Rajsic and expose him to substantial liability.

214. Cortese is also an interested manager, lacks independence from Rajsic, and faces a substantial likelihood of liability. As alleged herein, he has joined in the scheme to usurp Board authority by aligning with Rajsic's declaration that he can unilaterally as the majority member; declaring that he can act unilaterally as the Companies' CEO, without proper Board oversight or approval; and taking or causing to be taken various improper actions in breach of the Operating Agreements and in violation of his fiduciary duties under Delaware law. These actions include but are not limited to knowingly refusing to cause payment of Tax Distributions required by the Operating Agreements while authorizing a Tax Distribution to Abacus and

adopting pretextual positions about liquidity and offsetting prior losses; shifting his personal defense costs to the Companies by treating virtually all litigation work as Company work; and participating in withholding books and records from Plaintiffs. Cortese is incapable of impartially considering a demand adverse to Rajsic and to himself.

215. Rajsic and Cortese constitute one-half of the Companies' managers. They both have materially benefited from the wrongs alleged, face a substantial likelihood of liability from these claims, and lack independence from each other. Under these circumstances, pre-suit demand would not be considered impartially or result in the Companies' pursuit of these claims.

**<u>COUNT VI</u>**
**(Conspiracy)**
**Against Rajsic, Abacus, Denou, and Cortese**

216. Plaintiffs incorporate by reference paragraphs 1 through 155 above.

217. Rajsic, Abacus, Denou and Cortese constitute a combination of two or more persons.

218. As alleged above, Rajsic, in violation of his fiduciary duties, has implemented an extortionate scheme to block the payment of Distributions, including Tax Distributions, unless and until Plaintiffs transfer him a 75% interest in and complete control over the Companies.

219. Rajsic, Abacus, Denou, and Cortese had a meeting of the minds with respect to the aforementioned scheme, the goal of which is to deprive The RJB Trust and Mainstream of Distributions in order to coerce Berman and Krneta into meeting Rajsic's demand for additional equity and full control.

220. In furtherance of the conspiracy, these Defendants undertook overt acts to participate in the scheme. As alleged above, Cortese has devised pretextual reasons to artificially reduce the Tax Distributions owed to Mainstream and The RJB Trust, and he directed what little has been paid to the Rajsic-controlled Abacus, even though the payment relates to a year in which Mainstream and Krneta, not Rajsic, incurred a tax liability. Abacus and Denou, in turn, have refused to remit the Tax Distribution to Mainstream unless Mainstream and Krneta sign a release of claims.

221. As a direct result of the conspiracy, Plaintiffs have suffered damages.

**COUNT VII**
**(Breach of Contract—Transfer Agreement)**
**Against Denou**

222. Plaintiffs incorporate by reference paragraphs 1 through 155 above.

223. Section 2 of the Transfer Agreement requires that, "in the event that there are any … tax consequences in any way relating to … the operation of [Abacus] or any of its assets, all such obligations shall be the sole responsibility of [Abacus] and no such matters shall be the obligation of [Mainstream] and [Denou] hereby

agrees to indemnify, defend and hold harmless [Mainstream] from and against any and all such obligations."

224. To effectuate this indemnification, Denou must remit to Mainstream any Tax Distributions that Abacus receives from the Companies that relate to taxable income earned from January 1, 2024 through November 11, 2024, as such Tax Distributions relate to a tax liability incurred when Abacus was controlled by Krneta.

225. Denou has refused to remit the $659,778.45 in partial Tax Distributions that Abacus received for 2024, even though Abacus has admitted it owes these funds to Mainstream.

226. Denou's refusal to remit the $659,778.45 constitutes a breach of the Transfer Agreement and has caused Mainstream to incur losses, including without limitation reasonable attorneys' fees and expenses to enforce its contractual rights.

227. Under Sections 5(b) of the Transfer Agreement, Denou is obligated to indemnify Mainstream for all such losses, including attorneys' fees.

228. As a direct result of Denou's breaches, Mainstream has suffered damages.

**COUNT VIII**
**(Unjust Enrichment)**
**Against Abacus**

229. Plaintiffs incorporate by reference paragraphs 1 through 155 above.

230. On October 6, 2025, Cortese authorized a Tax Distribution of $659,778.45 to Abacus. That payment corresponds to 2024 taxable income allocated before November 11, 2024, when Abacus was controlled by Mainstream/Krneta. The associated 2024 tax liability therefore passed through to Mainstream/Krneta. Abacus has nevertheless refused to remit the payment to Mainstream, despite admitting that it owes these funds to Mainstream.

231. By retaining the $659,778.45 payment, Abacus has been unjustly enriched at Mainstream's and Krneta's expense. In equity and good conscience, Abacus should be required to remit the payment to Mainstream.

232. Abacus has no legal justification to retain the payment. The funds relate to a period when Abacus was owned and controlled by Mainstream. Abacus has also admitted that it owes these funds to Mainstream yet continues to withhold them.

233. Plaintiffs have no adequate remedy at law.

## COUNT IX
## (Alter Ego)
## Against Rajsic, Abacus, Denou

234. Plaintiffs incorporate by reference paragraphs 1 through 155 above.

235. At all relevant times, Rajsic exercised complete domination and control over Abacus and Denou, which are vehicles Rajsic uses to carry out his improper and fraudulent scheme to render himself judgment-proof and evade satisfying valid contractual and legal obligations.

236. Following his guilty plea to three felony counts of forgery, Rajsic became subject to a civil judgment that, on information and belief, today exceeds $7 million. To evade payment of this judgment, Rajsic moved his assets offshore and has used Denou to render himself judgment-proof. To evade payment obligations, Rajsic appointed his childhood friend, Borojevic, as the straw owner of Denou, while continuing to maintain beneficial ownership and control over Denou. Denou thus functions as an instrumentality of fraud and injustice, allowing Rajsic to disclaim any legal interest in that entity and avoid paying creditors.

237. Rajsic's use of a strawman is part of his *modus operandi*, as, on information and belief, he has similarly appointed Koucoi as the straw owner of Sun Africa Infrastructure Nigeria Limited.

238. Despite at times disclaiming formal ownership of Denou, Rajsic beneficially owns and controls it. Denou's nominal owner, Borojevic, is a long-time friend who acts as a straw owner for Rajsic and is paid by the Companies as an "office manager" in Serbia while, in reality, performing personal services for Rajsic. Denou operates for Rajsic's benefit and at his direction.

239. Denou wholly owns Abacus, which Rajsic admits he controls. Acting through Abacus as the Companies' majority member, Rajsic caused Abacus to appoint him as a manager and has used that position to direct Company actions without the Board's approval, as alleged herein.

240. On information and belief, Abacus and Denou are inadequately capitalized. Abacus is maintained as a shell to hold shares, and Denou is run for Rajsic's personal purposes.

241. On information and belief, neither Abacus nor Denou observe corporate formalities. The lack of corporate formalities is evidenced by, among other things, Rajsic's use of a straw owner for Denou.

242. Abacus and Denou are not treated with separateness. For example, although Denou has an obligation to indemnify Mainstream under the Transfer Agreement, Abacus has told Mainstream that it will pay the $660,000 Tax Distribution to Mainstream if Mainstream executes a release that benefits Abacus and its affiliates, including Rajsic and Denou. Rajsic has also directed Denou to make payments to other affiliated entities through which he owns personal real estate assets.

243. The foregoing establishes a unity of interest and ownership among Rajsic, Abacus, and Denou. Recognizing separateness would sanction fraud and promote injustice because Rajsic has used Abacus and Denou to evade judgments and tax obligations, divert or withhold funds owed to Plaintiffs, leverage his control over the Companies' distributions for personal gain, and obscure true ownership and control through a straw owner and sham formalities.

244. Accordingly, Plaintiffs seek a declaration that Rajsic, Abacus, and Denou are alter egos of one another and that they are jointly and severally liable for all damages and other relief awarded in this action.

**<u>COUNT X</u>**
**(Contractual Indemnification)**
**Against Sun Africa and UGTR**

245. Plaintiffs incorporate by reference paragraphs 1 through 155 above.

246. The Operating Agreements are valid and binding contractual agreements.

247. Section 6.7(a) of the Operating Agreements provides:

> *Company Indemnity*. To the maximum extent permitted by law, the Company shall indemnify and hold harmless all Members, the Officers and current and former Managers (each, an "Indemnitee") from and against any and all losses, claims, demands, costs, damages, liabilities, joint and several, expenses of any nature (including attorneys' fees and disbursements), judgments, fines, settlements, penalties and other expenses actually and reasonably incurred by the Indemnitee in connection with any and all claims, demands, actions, suits, or proceedings, civil, criminal, administrative or investigative, in which the Indemnitee may be involved, or threatened to be involved, as a party or otherwise, by reason of the fact that the Indemnitee is or was a Member, an Officer or a member of the Board of the Company, arising out of or incidental to the business of the Company.

248. Plaintiffs are Indemnitees under this provision and have incurred and will continue to incur costs and expenses, including attorneys' fees, in connection

with this action by reason of their status as managers and members of the Companies, including to address Defendants' efforts to bypass their governance rights and to compel Defendants' compliance with the Operating Agreements.

249. Plaintiffs are therefore entitled, under the Operating Agreements, to indemnification for their costs and expenses, including attorneys' fees, incurred in connection with this action and related matters.

250. Plaintiffs seek a declaration that they are entitled to indemnification in accordance with the Operating Agreements and an order that the Companies comply with its indemnification obligations in a timely manner.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment as follows:

A. Declaring the parties' rights as members and managers under the Operating Agreements;

B. Declaring that all actions taken by or on behalf of the Companies from November 11, 2024 to the present without proper approval of the Board and, where applicable, meeting the Heightened Approval Requirements, are null and void, and that Rajsic and Cortese should reimburse the Companies for all unauthorized payments;

C. Ordering Defendants to immediately make all Distributions, including Tax Distributions, required under Sections 4.1 and 4.1(a) of the Operating Agreements;

D. Declaring that Rajsic, Abacus, and Denou are alter egos of one another and that they are jointly and severally liable for all damages and other relief awarded in this action;

E. Entering judgment in favor of Mainstream and against Denou for breach of the Transfer Agreement's indemnification provisions;

F. Ordering Abacus to disgorge and make restitution to Mainstream in the amount of $659,778.45 wrongfully retained;

G. Declaring that Rajsic, Cortese, and Abacus have breached their fiduciary duties of loyalty and good faith to Mainstream and The RJB Trust;

H. Declaring that Rajsic, Cortese, and Doyle have breached their fiduciary duties of loyalty and good faith to the Companies;

I. Ordering Sun Africa and UGTR to promptly indemnify Plaintiffs for any and all losses, claims, demands, costs, damages, liabilities, joint and several, expenses of any nature (including attorneys' fees and disbursements), judgments, fines, settlements, penalties and other expenses actually and reasonably incurred in connection with this action and related matters;

J. Awarding Plaintiffs compensatory damages in an amount to be proven at trial;

K. Ordering an accounting of the Companies;

L. Awarding to Plaintiffs all costs and fees incurred in connection with this action, including reasonable attorneys' fees;

M. Awarding pre- and post-judgment interest; and

N. Granting such other and further relief as the Court deems just and proper.

OF COUNSEL:

Renee Zaytsev
Jack Tubio
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
(212) 446-2300
rzaytsev@bsfllp.com
jtubio@bsfllp.com

Courtney Caprio
CALDERA LAW
7275 NW 1st Ct, Unit 104
Miami, FL 33150
(786) 321-3811
courtney@caldera.law

Dated: February 10, 2026

*/s/ Travis S. Hunter*
Rudolf Koch (#4947)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
koch@rlf.com
hunter@rlf.com

*Attorneys for Plaintiffs*